# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30643

In re: WILLIAM L. GOODE,

Appellant.

United States Court of Appeals
Fifth Circuit

**FILED**

April 18, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Louisiana

Before KING, JOLLY, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal involves a challenge to Western District of Louisiana Local Criminal Rule 53.5 ("L. Crim. R. 53.5"), which operates as a prior restraint against attorney speech during the pendency of a criminal trial. William L. Goode, a criminal defense attorney practicing in Lafayette, Louisiana, appeals his six-month suspension from the Western District of Louisiana, which was imposed due to his violation of L. Crim. R. 53.5. For the following reasons, we reverse and remand to the district court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Central to this appeal is the extent of Goode's involvement in the underlying criminal trial. In June 2012, Goode represented a client, Joshua Espinoza, at his initial appearance and arraignment. Goode later withdrew as counsel of record, and new counsel was appointed under the Criminal Justice Act. A superseding indictment was issued in September 2012, adding seven

No. 15-30643

new defendants, including two attorneys, Daniel Stanford and Barry Domingue. Stanford and Domingue went to trial, while the remaining defendants pleaded guilty.

Stanford and Domingue proceeded to trial under an informal defense agreement and represented themselves pro se. Goode was never enrolled as counsel of record for either defendant, but both Stanford and Goode represented to the district court that Goode "would be 'assisting' Stanford." In response, the Government filed a motion to determine whether Goode should be disqualified to represent Stanford "in any capacity" based on his previous representation of Espinoza. The Government moved to withdraw its motion once it was determined that Goode had "no intention to represent Defendant Stanford in any capacity," which the district court granted.

The trial began on March 31, 2014. During the trial, Goode "sat in front of the bar and conferred with, and passed notes to, both defendants." On April 2, 2014, Domingue suffered from a self-inflicted gunshot wound. That morning, the district court held a hearing to evaluate its options in proceeding with the trial against Stanford. At the hearing, the Government stated it would not oppose if the court declared a mistrial. A decision on the matter was postponed until later that afternoon in order to give Stanford the opportunity to visit Domingue in the hospital before he died. When the hearing reconvened, Stanford requested a mistrial, which the district court granted.

Between the morning and afternoon hearings, Goode gave interviews to two media outlets, *The Advocate* and *The Independent* regarding Domingue. According to Goode, he spoke to the media in an attempt to "protect [his] friend's good name" and only under the belief that a mistrial would be declared. Goode claims he told the reporter for *The Advocate*, the first reporter he spoke with, not to publish anything until he had called back to confirm that a mistrial had been declared. But, the reporter did not abide by his request, and an article

2

was published online before a mistrial was officially granted. Goode's statements to the media related to the following facts: Domingue had shot himself in the head with a 9 mm pistol; Domingue was Goode's friend; Domingue had to shut down his law practice and spend the majority of his time preparing for his defense; Domingue was innocent of the charges against him; and the Government's case was "made up." Goode's two interviews that day ultimately resulted in the publication of five articles.

By the afternoon hearing, the district court had become aware of and expressed its displeasure with Goode's statements to the media. The Government moved for sanctions and a protective order barring Goode from further speaking to the press. The court refrained from ruling on the issue at that time and directed the Government to file a motion for sanctions instead. But, the Government never filed such a motion, and on May 23, 2014, the district court sua sponte issued an order directing Goode "to show cause why sanctions should not be imposed based on allegations of inappropriate, extrajudicial commentary to news media during the course of this proceeding, and most significantly, during the time immediately surrounding the recent mistrial granted on April 2, 2014."

Following a show cause hearing, the district court found that Goode violated both the local rules for the Western District of Louisiana and Louisiana's Rules of Professional Conduct, and it referred the matter to the Chief Judge of the Western District "for the appropriate suspension of practice from the Western District." Goode was permitted to file a brief before the Chief Judge in which he argued that the applicable local and professional rules violated his free speech rights afforded by the United States Constitution and the Constitution of the State of Louisiana. Specifically, Goode cited the Supreme Court's decision in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), in support of this argument.

3

No. 15-30643

On January 30, 2015, the Chief Judge of the Western District of Louisiana, Chief Judge Drell, issued an opinion and order sanctioning Goode pursuant to Local Rule 83.2.10 for violating L. Crim. R. 53.5. The rule states:

> During the trial of any criminal matter, including the period of selection of the jury, no lawyer associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating to the trial or the parties or issues in the trial, for dissemination by any means of public communication, except that the lawyer may quote from or refer without comment to public records of the court in the case.

In his order, Chief Judge Drell found that a sanction was appropriate under the rule because Goode was an attorney "associated" with the defense. In support of his conclusion, Chief Judge Drell noted that: 1) Goode helped Stanford in both preparing for the case and during the two days of trial; 2) Goode "sat in front of the bar (where lawyers who are participating in court proceedings sit)"; 3) and Goode "passed notes and made comments" to both defendants during the two days of trial. In response to Goode's briefing, Chief Judge Drell agreed that *Gentile* controlled but found that the application of L. Crim. R. 53.5 was constitutional, explaining that Goode's statements "involved a substantial likelihood of prejudice in the pending case" because "[i]f a mistrial had not been declared, there was a significant likelihood that even the empaneled jury could be prejudiced simply because the news of suicide by defendant was such big news, it would have been difficult to contain even for those empaneled jurors."

Based on his violation of L. Crim. R. 53.5,[1] Goode was suspended from practice in the Western District of Louisiana for a six-month period. Following

---

[1] Initially, Goode was referred to Chief Judge Drell for sanction based on L. Crim. R. 53.3, L. Crim R. 53.5, and Louisiana Rule of Professional Conduct 3.6, for statements he made to the media initially after indictments were issued and statements he made to the media after Domingue's suicide. Because Goode was ultimately only sanctioned for violating L.

No. 15-30643

this period, Goode could petition to be readmitted to the Western District pursuant to Local Rule 83.2.10. Goode appealed the sanction, and the district court stayed its suspension pending appeal.

## II. DISCUSSION

The Rules Enabling Act provides the Western District of Louisiana with the power to "prescribe rules for the conduct of [its] business." 28 U.S.C. § 2071(a); *see also* Fed. R. Civ. P. 83(a)(1) ("After giving public notice and an opportunity for comment, a district court, acting by a majority of its district judges, may adopt and amend rules governing its practice."). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

On appeal, Goode makes three primary arguments. As a preliminary matter, he disputes whether his conduct during Domingue and Stanford's trial falls within the scope of L. Crim. R. 53.5. Next, he argues that if his conduct is covered by the rule, the district court failed to make a necessary finding of bad faith, which was required in order to impose sanction. Finally, he brings both an as applied and facial challenge to the constitutionality of L. Crim. R. 53.5.

## A.    The Scope of L. Crim. R. 53.5

Goode argues that he does not fall within the scope of L. Crim. R. 53.5 as he was not "'a lawyer associated with the . . . defense.'" Goode urges this Court to adopt a "bright-line rule" in interpreting L. Crim. R. 53.5 that limits its scope to "trial participants," specifically counsels of record. Appellee[2] counters that, by its terms, the rule is not limited to counsels of record and urges a broader interpretation of the rule that focuses on an attorney's "unique access to information," not his or her official status in the underlying trial.

---

Crim. R. 53.5, we need not discuss L. Crim. R. 53.3 and Louisiana Rule of Professional Conduct 3.6.

[2] Counsel was appointed to represent the district court's interest.

No. 15-30643

Goode does not dispute any of the facts underlying his sanction and does not argue that the district court abused its discretion in imposing a particular sanction. He only challenges whether his conduct violates L. Crim. R. 53.5, which is a legal conclusion subject to de novo review. *See United States v. Nolen*, 472 F.3d 362, 371 (5th Cir. 2006).

Goode argues that the Supreme Court's opinion in *Gentile* and our opinion in *United States v. Brown*, 218 F.3d 415 (5th Cir. 2000), demonstrate that prior restraints on attorney speech, such as L. Crim. R. 53.5, apply only to counsels of record. But, neither *Gentile* nor *Brown* can be read to require such a limitation. In *Gentile*, the Supreme Court held that "the speech of *lawyers representing clients* in pending cases may be regulated under a less demanding standard than that established for regulation of the press." 501 U.S. at 1074 (emphasis added). From this holding, Goode asks us to infer that no attorney speech may be regulated unless the attorney is a "lawyer[] representing clients," which he appears to define as counsels of record.

But, the Supreme Court's holding was not so expansive. *Gentile* only involved the appeal of a specific Nevada ethics rule that just happens to have consistently been interpreted "as applying only to lawyers in pending cases, and not to other lawyers or nonlawyers." *Id.* at 1072 n.5. The Court expressly provided "no opinion on the constitutionality of a rule regulating the statements of a lawyer who is not participating in the pending case about which the statements are made." *Id.*

This Court's opinion in *Brown* was similarly limited, addressing the constitutionality of a specific gag order. 218 F.3d at 423. The gag order at issue applied to "parties, lawyers, and potential witnesses." *Id.* at 418. This Court stated that the gag order was "directed at trial participants," *id.* at 425, and Goode asks this Court to infer that "trial participants" only includes counsels of record because they were the only lawyers covered by the gag order at issue.

However, like *Gentile*, nowhere in *Brown* did this Court announce a blanket rule limiting restrictions on attorney speech to only counsels of record.[3]

Therefore, the scope of L. Crim. R. 53.5 rests on an interpretation of its language, specifically the phrase "lawyer associated with the prosecution or defense." Goode urges an interpretation of "associated" "in the conventional sense that 'associate' is used in law to mean being 'connected [] as a business partner or companion.'"

Suspending an attorney is a "quasi-criminal punishment" and "any disciplinary rules used to impose this sanction . . . must be strictly construed resolving ambiguities in favor of the person charged." *United States v. Brown*, 72 F.3d 25, 29 (5th Cir. 1995). Even strictly construing L. Crim. R. 53.5, the plain language of the rule does not support Goode's interpretation. The rule does not expressly limit its scope to counsels of record. But most importantly, Goode's emphasis on "associate" focuses on the use of the word as a noun, while "associated" in L. Crim. R. 53.5 is a verb.

The Oxford English Dictionary defines "associate" when used as a verb as "[t]o join (persons, or one person with . . . another), in . . . common purpose, action, or condition; to link together, unite, combine, ally, confederate." Oxford English Dictionary (2015) (emphasis omitted). Throughout the trial, in the media, and at his disciplinary proceedings, Goode stressed that, although he was not counsel of record, he was helping Stanford with his case. Goode assisted Stanford with trial preparation, attended several of the pretrial hearings, and passed notes to Stanford during the proceedings. Under the

---

[3] Goode has pointed to no case in our Circuit interpreting the phrase "associated with." However, he does point to one case, *United States v. Aldawsari*, 683 F.3d 660 (5th Cir. 2012), that he argues interpreted language similar to L. Crim. R. 53.5—"involved with the proceedings." But, his argument is without merit as there is no indication in the opinion that the phrase "involved with the proceedings" was actually used in the gag order at issue. *See Aldawsari*, 683 F.3d at 665.

plain language of the rule, we hold that Goode falls within the scope of L. Crim. R. 53.5 as an "attorney associated with . . . the defense."

## B.    Finding of Bad Faith

Goode argues that the district court was required to make a finding of bad faith in order to discipline him under L. Crim. R. 53.5. In response, Appellee distinguishes between sanctions imposed pursuant to a court's inherent power and sanctions imposed pursuant to a district court's local rules, arguing that a finding of bad faith is only a prerequisite to sanctions imposed through the former.

This Court has consistently distinguished between a court's inherent power and its local rules. *See, e.g.*, *Carroll v. The Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292–93 (5th Cir. 1997); *Ehm v. Amtrak Bd. of Dirs.*, 780 F.2d 516, 517 (5th Cir. 1986) (per curiam); *Martin-Trigona v. Morris*, 627 F.2d 680, 682 n.1 (5th Cir. 1980) (per curiam). Federal courts enjoy the inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). This power includes the ability to discipline attorneys, punish for contempt, control admission to its bar, and vacate judgments. *Id.* at 43–44. Most relevant to the instant suit is the ability of federal courts to "suspend or dismiss an attorney as an exercise of [their] inherent powers." *Resolution Tr. Corp. v. Bright*, 6 F.3d 336, 340 (5th Cir. 1993).

It is well settled that in order for a federal court to sanction an attorney under its inherent powers, it must make a specific finding that the attorney acted in bad faith. *E.g.*, *Dawson v. United States*, 68 F.3d 886, 895 (5th Cir. 1995). But, this Circuit has never explicitly extended this requirement to

sanctions imposed pursuant to a local rule, and we decline to do so here.[4] As we conclude that the district court was not required to make a finding of bad faith before sanctioning Goode under L. Crim R. 53.5, we turn to Goode's constitutional challenge.

## C.    First Amendment Challenge

Goode argues that L. Crim. R. 53.5 is unconstitutional both on its face and as applied in his case. Whether the First Amendment has been violated is a mixed question of law and fact; therefore, our review is de novo. *LLEH, Inc. v. Wichita Cty.*, 289 F.3d 358, 364–65 (5th Cir. 2002). Because it is preferable to avoid addressing an overbreadth facial challenge if an as-applied challenge prevails, *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 484–85 (1989), we will address Goode's as-applied challenge first.

Prior restraints—defined as "predetermined judicial prohibition[s] restraining specific expression"—such as L. Crim R. 53.5,[5] receive a "presumption against their constitutionality." *Brown*, 218 F.3d at 424–25 (quoting *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir. 1980)). Generally, a prior restraint is constitutional only if the Government "can establish that 'the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest.'" *Id.* at 425 (quoting *Levine v. U.S. Dist. Court for Cent. Dist. of Cal.*, 764 F.2d 590, 595 (9th Cir. 1985)). The Government must also demonstrate that the prior restraint is narrowly tailored and provides the least restrictive means to achieve the Government's goal. *Id.*

---

[4] Goode points to *In re Thalheim*, 853 F.2d 383 (5th Cir. 1988), to support his argument that the district court needed to make a finding of bad faith before imposing any sanction. But, the discussion of bad faith in *Thalheim* appears only in dicta and, therefore, cannot be interpreted as an explicit extension of the bad faith requirement. *See Thalheim*, 853 F.2d at 389.

[5] Neither party disputes that L. Crim. R. 53.5 is a prior restraint.

No. 15-30643

In the context of criminal trials, an individual's right to free speech must be balanced with the state and the defendant's interest in a fair trial. *Id.* at 423. "Intense publicity surrounding a criminal proceeding," otherwise referred to as "trial by newspaper," "poses significant and well-known dangers to a fair trial." *Id.* at 423 (quoting *Pennekamp v. Florida*, 328 U.S. 331, 359 (1946) (Frankfurter, J., concurring)). The most significant of these dangers is the possibility that pretrial publicity will taint the jury venire. *Id.* Courts "must therefore balance the First Amendment rights of trial participants with our 'affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity.'" *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (quoting *Brown*, 218 F.3d at 423). Citing this concern, the Supreme Court has upheld stronger limitations on the speech of "those participating before the courts" as compared to members of the press. *Gentile*, 501 U.S. at 1072 (emphasis omitted); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (collecting cases).

Specifically, in *Gentile*, the Supreme Court held that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press." 501 U.S. at 1074. Central to the Supreme Court's decision was the fact that "lawyers have special access to information through discovery and client communications." *Id.* Therefore, "their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative." *Id.* But, *Gentile* did not set a controlling standard for all restraints on attorney speech. *See Brown*, 218 F.3d at 426 (explaining that "the Supreme Court merely approved Nevada's 'substantial likelihood' standard . . . but did not mandate it as a constitutional minimum necessary to justify a judicially-imposed restriction on attorney speech").

10

Instead, the Court was tasked to review a First Amendment challenge to a specific Nevada attorney ethics rule that stated: "A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile*, 501 U.S. at 1060. The Supreme Court upheld the rule, explaining that it "constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials." *Id.* at 1075. The Court went on to explain that the test is constitutional because "it is designed to protect the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on lawyers' speech." *Id.*

In *Brown*, our Court considered a First Amendment challenge to a district court's gag order that prohibited "attorneys, parties, or witnesses from discussing with 'any public communications media' anything about the case 'which could interfere with a fair trial,' including statements 'intended to influence public opinion regarding the merits of this case,' with exceptions for matters of public record and matters such as assertions of innocence." *Brown*, 218 F.3d at 418. As described above, in the typical prior restraint case, a court must find the restrained activity "poses either a clear and present danger or a serious and imminent threat to a protected competing interest." *Id.* at 425 (quoting *Levine*, 764 F.2d at 595). In *Brown*, our Court lowered the "showing of harm necessary" to impose a prior restraint on trial participants stating that "a district court may . . . impose an appropriate gag order on parties and/or their lawyers if it determines that extrajudicial commentary by those individuals would present a '*substantial likelihood*' of prejudicing the court's ability to conduct a fair trial," leaving open the question whether a "reasonable likelihood" standard would suffice. *Id.* at 425, 427 (emphasis added).

11

Additionally, the Court explained that prior restraints on trial participants must be narrowly tailored to only prohibit speech that has a "meaningful likelihood of materially impairing the court's ability to conduct a fair trial." *Id.* at 428–29. The prior restraint must also be the least restrictive means available. *Id.* at 425.

On its face, L. Crim. R. 53.5 does not incorporate either a "substantial likelihood standard" or even a "reasonable likelihood" standard, as required under *Brown*. Instead, it operated as a complete bar on any of Goode's speech "relat[ed] to the trial or the parties or issues in the trial" and disseminated through public communication during the pendency of the trial. The only exception to the rule would have allowed Goode to read from the public record without comment. Complicating the as-applied challenge, in his opinion and order imposing sanction, Chief Judge Drell cited *Gentile* and found that a sanction was appropriate because Goode's comments to the media were substantially likely to prejudice the jury because "[i]f a mistrial had not been declared, there was a significant likelihood that even the empaneled jury could be prejudiced simply because the news of suicide by defendant was such big news." But, even assuming without deciding that this finding, which was made after the trial had ended and the potential for prejudice was over, is sufficient to comply with the requirements of *Brown*, L. Crim. R. 53.5 must also be narrowly tailored and the least restrictive means of achieving a government interest.[6]

In *Brown*, this Court determined that the gag order at issue was narrowly tailored because it was "sufficiently narrow to eliminate substantially only that speech having a meaningful likelihood of materially

---

[6] The district court did not address either requirement in its opinion and order imposing sanction.

impairing the court's ability to conduct a fair trial." *Id.* at 429. But, L. Crim. R. 53.5 is not so limited. As applied to Goode, the rule acted as a complete bar on any speech "relat[ed] to the trial or the parties or issues in the trial" and disseminated through public communication during the pendency of the trial. Appellee has failed to demonstrate how such an expansive rule is narrowly tailored. *See Brown,* 218 F.3d at 429–30 ("[W]e observe that the district court did not impose a 'no comment' rule, but instead left available to the parties various avenues of expression, including assertions of innocence, general statements about the nature of an allegation or defense, and statements of matters of public record."); *Chi. Council of Lawyers v. Bauer*, 522 F.2d 242, 251 (7th Cir. 1975) ("We do not believe that there can be a blanket prohibition on certain areas of comment[,] a per se proscription without any consideration of whether the particular statement posed a serious and imminent threat of interference with a fair trial.").

Similarly, Appellee has failed to demonstrate how L. Crim. R. 53.5 is the least restrictive means available to achieve its goal. Alternatives to prior restraints include "change of venue, jury sequestration, 'searching' voir dire, and 'emphatic' jury instructions." *Brown*, 218 F.3d at 431. L. Crim. R. 53.5 operated as a prior restraint on Goode regardless of the feasibility of other options. While it was not necessary for the district court to provide a full analysis of all of the alternative means available, *see id.* at 431, this Court cannot imply from the record that L. Crim. R. 53.5 provided the least restrictive means of safeguarding against the risk of prejudice, particularly in light of the fact that the rule applied prior to Domingue's suicide and prior to the increased risk noted by the district court, *see id.*

Even assuming that L. Crim. R. 53.5, as applied by the district court, complies with *Brown*'s holding that a court may impose a prior restraint on trial participants' speech if it is "substantially likely to materially prejudice" a

No. 15-30643

case, Appellee has failed to demonstrate that L. Crim. R. 53.5 was narrowly tailored to only prohibit such speech and that it was the least restrictive means of safeguarding against prejudice. Therefore, we hold that L. Crim. R. 53.5 is unconstitutional as applied to Goode. In light of this holding, we need not address Goode's facial challenge. *See Fox,* 492 U.S at 484–85.

### III. CONCLUSION

For the foregoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion

14